All rise. Illinois's public court burden division is now in session. Honorable Justice Leroy K. Martin, Jr. is decided. Thank you. Please be seated. Would counsels who are going to argue the matter step forward, please? And introduce yourself. I just want to remind you that the microphone in front of you, while it doesn't amplify, it does record the proceedings. So if you'd just introduce yourself and who you represent, please. Leslie Rosen, I'm here on behalf of the petitioner appellant Chen Shen Ni. Thank you. Counsel? Justice Martin, I'm Amir Thomasby. I'm here on behalf of Martin Lundgren individually and also as the executor and trustee of the Martin Lundgren estate, senior. Very good. Counsels, we normally allow 15 minutes for each of you. If you would like to reserve time for rebuttal, simply let me know how much time you'd like. I'll reserve three minutes. Three minutes? I have a lot to say. Wonderful. I'm sorry. We'll call the case for the record. I suppose I was just too anxious to hear this argument that I know that each of you are going to give us. And so I wanted to get to you even before they called the case. I like that. Okay, counsel, you can be seated. Okay, thank you. I like that you call me Judge Adam Clark. You're not a justice. I know. I get that all the time. I'm Amir Martin, by the way. This is Justice Rochford and Justice Reyes. Nice to see you all. It's a pleasure to be back in open court. I'm sure you all know what this case is about. It's another case of bad behavior, like the last case was bad behavior. This is a case where there was a family dispute, a blended family dispute, and my client, Chen Chen Ni, was married to the decedent and the testator, Martin Longgren Sr. She met him in 89, moved in with him in 92, married him in 2005 and lived with him until his death. One of his sons was dissatisfied with his estate plan, the trustee, Martin Longgren. Martin was a man who changed his estate plan often. If you look in the record, you can see it. In 2017, he had an estate plan that left Chen Chen 100% of the beneficial interest in one building in Old Town. Martin was a very lucky guy. His grandmother and his parents bought two buildings on North Wells Street in Old Town, valuable property. So Martin left in his 2017 estate 100% of one building to his wife, Chen Chen, and the other building 55% to Chen Chen and 45% to Mark. He cut out his other two kids. There's no dispute about that and no complaint about that. But in 2018, Mark was dissatisfied. He didn't think Chen Chen was taking good care of his father or whatever. He met with his family. I'm sorry, Martin or Mark? Mark. Oh, I thought you said Mark. Yes, that's very important because Martin didn't meet with anybody in advance. Mark started meeting with his lawyer, Sharon Bacino, in spring of 2018 to talk about maybe getting his father divorced from Chen Chen, maybe getting a guardian, maybe changing his estate plan because he was afraid Chen Chen was going to sell the buildings. So I have a question. For the purposes of the under-influence analysis, does it matter how much Chen Chen received at the time of death? No. At the time of death or during Martin's life? Because the trial court found that the plan was not lopsided. Correct. Those were marital assets. So it wasn't like that was a bequest to her. I mean, they were marital assets. They were hers on death. Okay? She was the beneficiary. So no, I don't think that means nothing. Which were the marital assets? The non-resident, non-real estate assets. They're irrelevant to this case, I would say. That's my position. But in any case, so you understand the situation. And he had his share income. I have two arguments here. And together for six months they planned and talked and met. And then in November, November 8th. They planned for six months. I'm sorry. Who was planning? Mark. Okay. And his mother. They had two, didn't they? Didn't they have Mr. Krasinski and then Ms. Lucino? Lucino. I think it's Lucino. Okay. Lucino is the lawyer he met with. And she's the one in all the e-mails, with all the records, all the meetings, all the drafting. It's Sharon Lucino. Okay, so I have two arguments. The first one is undue influence. The second one is revocation. I am not going to argue about, unless you have questions, about their arguments of waiver. That I waived the whole appeal by not including the trial records. That was a non-issue, first of all. And it was remedied. I'm not arguing that, I'm not arguing about capacity. They say I waived everything because I didn't argue that he lacked capacity. That would have been a stupid argument. Nothing else you could say about it. You can't say, our position was that for two reasons it would have been idiotic. First of all, the trial lawyer for Shenshen Below failed to prove his case. He had a gap in the evidence of five months. But he had his expert, Dr. Shaw, come in and testify that Martin, who has had dementia, that was as of April of 2019. He had no opinion. So let me just stop for a second. So when he signed the revocation documents, you're not saying that he lacked capacity? No, no. Everybody agreed he had capacity. They didn't even have a counterclaim against Shenshen for undue influence or a lack of capacity for the December 21st estate plan. Okay? They didn't say that. Their view was he had capacity at all times. Okay. And my client, my lawyer Below, did not prove otherwise because he had a big gap in the evidence. And it also would have been inconsistent because you can't say he had no capacity on November 8th but that he'd had capacity a month and a half later. It would have been ridiculous. Okay. So I'm not talking about those.  So we're talking about undue influence. But first of all, I have to talk fast. This is hard. But you can breathe. You can take a breath. Thank you. Legal requirements for undue influence. Totality of the circumstances of each case. Yes. In re estate of Kaufman and Illinois Supreme Court case from 2023. The elements of the claim are well settled. They've been settled forever. There's four elements for a prima facie case of undue influence. A fiduciary relationship between the testator and a comparatively disproportionate beneficiary under the will. Two, a testator who was in a dependent situation where the beneficiary is in a dominant role. Three, a testator who placed trust and confidence in the beneficiary. And four, a will that was prepared or executed in circumstances where the beneficiary was instrumental or participated. In this case, it was Mark's position overwhelmingly that he didn't participate. And on appeal, he didn't argue that he didn't participate in procuring the will. He didn't argue disproportionate. It wasn't disproportionate. Well, yeah. And in fact, didn't his lawyer tell, excuse Mark from the proceedings when she was talking to Martin about, you know. Yes. Preparing the papers, having him sign the papers. Yes. She said leave the room. Okay. Yeah. Now, it used to be the law. And they're relying on old law. They're relying on a case from Sterling v. Dubin from 1955 that said that for undue influence to exist, it had to be at the actual execution. That is no longer the law in Illinois. Kaufman doesn't say that. That's a 55-year-old case. There is a case, Baumgarten does say it from 2012, but that's an appellate court case. And the Supreme Court case is overwhelming. So if you look at the overwhelming, if you look at the totality of the circumstances, and Judge Delgado found that Shenshen had proved a private plaintiff case of undue influence. It did not have to be. And the evidence of that in procurement is, to me, overwhelming. This is a case where after Martin had been diagnosed with dementia, his son, by his personal doctor, not Dr. Shaw, Mark retained the estate planning services of his lawyer without Martin's knowledge. He spent six months meeting with her, guardianship and will changes. He gave her information, not from Martin, but the buildings. His father would want the buildings to stay in the family home, and Shenshen would sell them. He gave her financial records without Martin's knowledge or permission. And he did that by using an expired, not expired, a revoked, sorry, a revoked POA for property. It was Sharon's idea to send Shenshen to China so she could meet with him, with Martin. That's crazy. So are you arguing that Ms. Burcino, if I said that correctly, was working for Mark? Absolutely. She was Mark's lawyer, not Martin's lawyer? Absolutely. Absolutely. She didn't even meet Martin. She's the one who comes up with the idea to send Shenshen away. Mark says, great idea, now let's get in there right away while Shenshen's in China. Then when she meets with Martin, she presents a pie chart that has inaccurate and inflated information. She tells Martin that Shenshen doesn't need his money so much because she has two condos. Maybe one condo, maybe two condos. Sharon didn't know anything about that. It was incorrect. And then she made changes to his estate plan without informing Martin of it. She didn't leave the estate plan with him and say, you know, sir, you should look at this and call me back. None of that. None of that. None of that. The new estate plan did three important things. It gave Mark the right to determine the fair market value of Shenshen's. Brilliant idea. Martin's very happy. He wants to provide for Shenshen. That's his primary goal. But he doesn't want to unless she gets married again. What about the testimony of Peter and Agnes? Okay. The profile, that was kind of evidence that there wasn't any exertion of federal funds.  He's wrong. Plain and simple. Because the testimony in this case was primarily, overwhelmingly about capacity. I mean, they talked capacity, capacity, capacity. Peter, I mean, oh, he said hi, Pete from Minnesota, which was evidence that he had capacity. He knew people. But he asked about everything else. It was wonderful. Now, okay, so the judge found, I have to go back a little. The judge found the prima facie case. And then Mark's job was to prove, to rebut that by clear and convincing evidence. And I have to show here that if there's conflicting evidence, that that finding was against the manifest weight of the evidence. I believe it was, but I also believe it's a matter of law because there was no conflicting evidence here. Because Pete from Minnesota only testified that it seemed to him, that Mark and, they had a good relationship. And he seemed not to be harassed. Agnes, who was Sherrilyn's employee, said she took her job very seriously. But she didn't ask a single question. And what's most important on these cases of undue influence is the case of the Franciscan sisters. It's from 1983. It's a really good case. They rely on it, but it helps us more. There, the witnesses spoke to the testator for about 15 minutes and asked all sorts of questions about undue influence. Here, nobody asked a single question. So I'm saying there was no conflicting evidence, so the manifest weight doesn't apply. And as a legal matter, because there was nothing conflicting here, they didn't ask the questions. They didn't know. It's not as though Pete and Agnes knew, or maybe Agnes knew. But Pete certainly, there's no evidence that he knew that Sherrilyn devised this at Mark's initiation and request. This isn't just a case where Mark paid for it, which he did. And also, Sherrilyn delivered this, I think, very sneaky thing. And two sneaky things. Now, she brings a contract. The second time she sees him, she brings a contract, a retainer agreement. The retainer agreement says, I'm going to bill you 365 an hour. Martin says, oh, that's too high. Okay, then I'll just bill you 125 an hour. Well, that must make Martin feel like he's a good guy, a real man. He feels good. He feels good. That's good. But it was bullshit. I'm sorry. I'm sorry. I'm so sorry. I'm so sorry. It was totally not true, because Mark was paying, and he's still paying Sherrilyn's bills. The other thing that she did, it might not have been a bad idea. She said, we're going to provide for Sherrilyn. We're going to give her 75% of the rents. This is a great one, because this is totally illusory. A better word. 75%. But she gives Mark the power to determine. Shanshan gets to live rent-free, and she gets her frame rent-free. But Mark gets to include in the calculations of what the 75% is the fair market value of those two apartments that she's now paying for. It's his sole discretion to determine them. And then they're to be included in the total amount of rents, and then it's to be considered that Shanshan's already gotten that money. So even though it says 75%, if you calculate it out, it's more like 50%. I'll just give you one example. 1505 has four apartments, including the garden. Each one goes for $3,000, just for example. So that's $12,000, right? After that, 75% would be $9,000. But you get $9,000, then you assume that Shanshan already got her $3,000. It takes it down to $6,000, which is 50% of the rents. And Sharon testified, well, he thought maybe give her 50%, and I said, no, 60% won't do it. 75% is the thing. Okay. So I think that that was, boom, undue influence. And what did Margaret do? He didn't do the – he did that show otherwise. He didn't burst the bubble. First of all, as I told you before, he said it had to take place at the siting. That doesn't true. Then he says that her claim for undue influence is dependent on the claim of lack of capacity and breach of fiduciary duty. That's not true either. They're all different claims with different elements of proof. He conflates the causes of action. One can have capacity but still be subject to undue influence. We know many people who have strong personalities but are subject to flattery and undue influence. Capacity is about knowing the value of your estate and the objects of your bounty. So substantively, he argues about Peter and Agnes. I talked about that already. And it's interesting, their opinions. Even if you consider Pete's opinion, that he seemed – didn't seem like there was undue capacity. What is the basis of that? As the court always says in cases involving experts, an opinion's only good as the basis for it. He had no basis for his opinion in light of the fact that he had no knowledge of what was going on here. Okay. So that takes care of undue influence. That's enough. Okay. Any questions on that? Am I time running out? Your time is up. Any questions? No. All right. So I know you want to save some time, so we'll let you come back in the bubble after. Okay. I guess my reply brief is particularly important on revocation. I'll say that. Very good. Okay. Thank you. All right. Thanks. So may it please the Court, Your Honors, Counsel. I'll be brief because I think you guys probably kind of see where this is going. But here's what I would say. I'm going to front the revocation issue. There was a January, Justice Reyes, Justice Rochford, Justice Martin, a letter from Shenshen's counsel that specifically said, if you do not agree to the revocation, we will say it is denial of revocation. So the argument that I think counsel is going to come up and make, Justice Reyes, is that we didn't send a letter. We didn't. Mr. Lundgren didn't say we're not. And I can see you, Justice Rochford, looking at me like, but he didn't have to because of that letter. And he had Ms. Pacino, who also, call it a negotiation, call it what you want, but she basically said we're not agreeing to the revocation. So that, to me, is very tenuous. What about the issue that counsel is arguing now with regards to the undue influence? Even though Mark wasn't present when the attorney was discussing the documents with Martin, her argument is that those activity and actions leading up to that, that caused the undue influence on Martin. Great question, Justice. And you know what? If you look at the Franciscan sisters case and you look at the other Supreme Court case, they say it's about what happened at the time. And so Mark was not there. He was not influencing. And more importantly, Justice, what the ultimate estate plan came out to be was fair. It was fair to Martin Sr.'s wife. She's being taken care of, which is what Judge Delgado was very careful to point out. And so that is circumstantial evidence, I would say, as to why what happened here was the correct thing. The buildings had – oh, go ahead. Yeah, I was just going to say, is Shen Shen receiving revenue from the buildings? She will as soon as there's revenue coming through. She's entitled to it. Yeah. They're not occupying the buildings? No, she's living rent-free right now in her apartment. She has her frame shop rent-free. And then Mark, Mr. Lundgren, excuse me, as soon as he has any – he's helping the buildings get better, right? They're old buildings in Old Town. Yeah, so she's entitled to receive basically a life estate, which is what, to me, Mr. Lundgren wanted her to have. He wanted her to be taken care of, which is fair. And so did he want her to have the buildings and be able to sell them? No. So, you know, God bless his soul, Mr. Lundgren. He took care of his wife in the estate plan that was put together on November 8th of 2018. I don't have a whole lot else to say. The standard, Justice Martin, you know better than anyone, and Justice Radford, is manifest way to the evidence. I have a question about the record. Is the record complete? So, it wasn't, but it wasn't our doing. Counsel had to supplement the record, and ultimately the trial court allowed it to be supplemented. So we have everything. So we have everything. And is manifest way to the evidence standard applicable to all the issues? Yes. I don't have anything further unless you guys have any questions for me. Okay, very good. Thank you. Thank you, Justice. Okay, three minutes. January 7th letter that was sent by the later lawyers, the December lawyers, Leon Zelikowski and Mr. Douglas, where Mr. Douglas said, we'll say if you don't hear back from me, we'll consider you saying no. That's not a legal matter. It's not a binding contract. This is a case where the words of the contract were clear and unambiguous. You don't go beyond the four corners. You don't look elsewhere. And that doesn't have anything to say about it. Number two, Sharon did not call Leon and say, we're not agreeing. That is not her testimony. She said, we think it's inappropriate. And then she thought they could work together, that he could send her the documents. Saying something is inappropriate is not saying you disapprove of it. Saying something is inappropriate is like something a mother would say to a teenage daughter about her at the length of her skirt. You don't know what she meant by that. If she did that, there was no real thing. Undue influence. Franciscan's case does say undue influence occurs at the time. That case was decided in 1983, however. It's an appellate court case. And it's not that the Kaufman — estate of Kaufman case, effect of 2023 by the Supreme Court, does not say that. So the ultimate estate plan was fair. You asked, Justice Martin, whether Mark has paid her anything. The record shows that by 2024, four years after the death, Chen Chen had not received a dime from Mark for any rent. So he's squeezing her out. What about the fact that she has her frame shop and that she has her apartment? I mean, she's not paying rent. Isn't that a form of compensation? That's not what the trust says. The trust says she's entitled to 75 percent of the rent. Recently, this case is still pending in the circuit court in front of Judge Delgado, and you can take judicial notice of the pleadings that are now online for everybody to see. We're having a fight over this matter right now over the money because she still hasn't gotten a penny. And we finally got an accounting that says Chen Chen owes him $21,000-plus. We don't know why, and we're fighting about that. So then, counsel, the fact that she is not paying rent for those two locations is of no moment. She should be collecting a portion of whatever rent is being paid? Is that her position?  That's my position. So the matter is in litigation. What is pending in the circuit court? Is it this case? Yes. Is it post-judgment issues? Yes. Yes. We're arguing about the accounting and that she's not gotten any money. Yes, that's a big issue. Are there any things that affect the jurisdiction of this court? No. They're collateral. Totally collateral. Yeah. Okay. So under the actual evidence, the estate plan is not fair. Thank you. Thank you. Thank you. All right. Thank you for an interesting argument, and we will take the matter under advisement, and you will hear from us within a reasonable length of time. Thank you. Thank you.